Charles E. DAVIS

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services.

Civ. A. No. 77–618.

United States District Court, E.D. Pennsylvania.

Feb. 22, 1983.

Charles E. Davis, pro se.

Serena H. Dobson, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM

LUONGO, Chief Judge.

This is an action under 42 U.S.C. § 1383(c) to review the final decision of the Secretary of Health and Human Services (Secretary) denying plaintiff's claim for supplemental security income. Presently before me are the parties' cross-motions for summary judgment.[1] For reasons discussed

---

1. In a memorandum opinion dated January 19, 1983 (document No. 31), I questioned *mea* *sponte* whether this court had jurisdiction to review the Secretary's decision because plain-

herein, I will deny the plaintiff's motion, grant the Secretary's motion for summary judgment and enter judgment in favor of the Secretary.

■ The Secretary found that plaintiff was not disabled within the meaning of the Social Security Act and, therefore, concluded that plaintiff was not entitled to supplemental security income. The sole issue for this court to determine is whether there is substantial evidence in the record as a whole to support the Secretary's findings. 42 U.S.C. §§ 405(g), 1383(c)(3). Under the substantial evidence test, the reviewing court is bound to accept the Secretary's findings of fact if supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

■ The record in this case is as follows. Plaintiff was born on August 8, 1936. Although he completed only the 10th grade, plaintiff did receive a high school equivalency diploma. Plaintiff's work history indicates that he has had experience as a maintenance worker, stock clerk, rigger and warehouseman. Plaintiff testified that he has not worked since the 1960's.

Turning to the medical evidence, the record contains a report from Richard Kaplan, M.D., which states that plaintiff was hospitalized in April 1973 with a diagnosis of traumatic asceptic necrosis of the left hip. During that hospitalization, a total replacement of plaintiff's left hip was performed (Tr. 98). The record also contains a medical summary and x-ray report from Misericordia Hospital dated May 29, 1975. This report states that plaintiff was involved in an automobile accident and suffered "a blunt injury to his left knee with small traumatic effusion" (Tr. 84). An ace bandage was applied, and plaintiff was released (*id.*). In

a later report dated November 12, 1975, Leo H. Ley, M.D., states that plaintiff has a history of heart disease, low back pain with two lumbar discs herniated and operated upon, and peptic ulcers. Dr. Ley's diagnosis was low back syndrome secondary to lumbar disc surgery, coronary artery disease and peptic ulcers. Although he performed no laboratory or special studies, Dr. Ley found that plaintiff had stiffness in the lumbar area. Dr. Ley concluded that plaintiff was unable to work due to his low back status (Tr. 86–89). Finally, the record contains two x-ray reports from Philadelphia General Hospital. The first of these, dated April 28, 1976, is a report of x-rays performed on plaintiff's left knee and pelvis. The x-ray of the pelvis showed a status left hip replacement with a "widened radiolucent space between the prosthesis and the medullary space of the left femur raising the possibility of loosening" (Tr. 139). The x-ray of the left knee was determined to be an "unremarkable study" with no significant interval change since a study performed two months previously (*id.*) The second x-ray report, dated May 3, 1976, also concerns a study of plaintiff's left knee. This report, in its entirety, reads as follows:

> The patella view does not demonstrate any abnormalities of the articulating surface of the posterior patella. The sunset view was unfortunately obtained with a low contrast technique. There is a suggestion of two radiodensities, immediately above and slightly lateral to both tibial spines in the intercondylar notch. These may be artifactual. They are not visible on other projections obtained some days ago.
>
> *CONCLUSIONS:* Two tiny densities on the femoral tunnel are seen, which may well be loose bodies.

(Tr. 140).

Also of record is the testimony given by plaintiff before an Administrative Law Judge (ALJ) at a hearing held on October 1, 1976.[2] Addressing his medical impairments,

---

tiff has not sought review within the 60 days allowed under 42 U.S.C. § 405(g). The Secretary has since agreed to waive the 60-day limitation (document No. 33).

**2.** Plaintiff appeared at the hearing *pro se.*

plaintiff testified that he has asthma and has suffered from allergies since birth (Tr. 37). Plaintiff further testified that one of his lungs had been removed and that he had visited a psychiatrist once or twice a week while he was in prison (Tr. 36–37). Since his release in 1970, plaintiff testified that he has not seen a psychiatrist or received any medical treatment for mental illness (Tr. 36). He does not suffer from hallucinations, takes no medications and manages his own affairs (Tr. 36, 41–42). Finally, plaintiff testified that his most serious medical problem involved his left hip (Tr. 38). Plaintiff stated that he was hospitalized in 1973 for about a month, following which he was on crutches for a "couple of years or more." Plaintiff is still under the care of Dr. Richard Kaplan, but plaintiff is taking no medications for his hip (Tr. 34–35).

Bernard Orr, a vocational expert, also testified at the October 1, 1976 hearing. Orr was asked three hypothetical questions. In the first hypothetical, Orr was asked whether, given plaintiff's age, education and work history, plaintiff could return to any of his former occupations. Orr responded affirmatively, stating that plaintiff could perform his prior work as a stock clerk (Tr. 48). In the second hypothetical, Orr was asked whether, given plaintiff's age, education and work history, and assuming that plaintiff could perform sedentary work, any occupations existed in the region which plaintiff could perform. Orr responded that there were, and he listed as examples: inspector, folder or packer in a garment factory; examiner of cloth in a garment factory; telephone salesperson or bill collector; bench assembler; drill press operator; and ticket taker in an amusement center (Tr. 48–50). Finally, Orr was asked whether, accepting all of plaintiff's complaints, limitations and restrictions, plaintiff could perform sedentary work. Orr again answered yes. According to Orr, plaintiff would have "no real problem with light or sedentary work" because as plaintiff described his own daily activities and abilities, plaintiff could sit and function (Tr. 50).

On October 1, 1976, ALJ Alan Neff issued his decision determining that plaintiff was ineligible for supplemental security income. With the exception of the two x-ray reports from Philadelphia General Hospital, which were not then in evidence, all of the above-discussed evidence was considered. The ALJ expressly rejected Dr. Ley's conclusion that plaintiff was unable to work because: (1) plaintiff never complained of any difficulties with his back, and (2) Dr. Ley's conclusion was "based entirely on history and subjective symptomology" (Tr. 14). The ALJ also rejected plaintiff's complaints of pain, concluding that "whatever pain the claimant did have either by itself or in conjunction with any other physical disability which claimant may have was not of such severity to prevent him from engaging in substantial gainful activity" (Tr. 14). The ALJ then made the following findings:

1. The claimant is 40 years of age, has a high school diploma and has worked as a maintenance man, rigger and stock clerk.

2. That the evidence of record does not establish that claimant suffers either singly or in combination from a physical or mental impairment of the severity required by the Act.

3. Claimant's symptoms, signs, medication, and treatment received, do not demonstrate that he suffers from a condition of such severity as to prevent claimant from engaging in substantial gainful activity.

4. That claimant does not suffer from pain either in itself or in conjunction with other impairments of such severity as to constitute claimant disabled within the meaning of the Act.

5. Considering claimant's residual functional capacity, and his age, education and work experience, he is able to return to his previous job as a stock clerk and to perform light and sedentary jobs which include the following representative jobs: inspector, folder or packer, garment industry; salesperson; bill collector; bench assembler; ticket taker; and drill or punch

press operator. These jobs exist in significant numbers in the region in which claimant lives as well as several other regions of the country.

6. The claimant was not prevented from engaging in any substantial gainful activity for any continuous period beginning on the date of application through the date of this decision.

7. The claimant was not under a "disability", as defined in Section 1614(c)(3)(A) of the Social Security Act, as of the date of filing the application for supplemental security income and continuing through the date of this decision.

(Tr. 15–16).

ALJ Neff's decision was affirmed by the Appeals Council and became the final decision of the Secretary. Plaintiff then sought judicial review in this court. Although I originally dismissed plaintiff's complaint for lack of jurisdiction (document No. 10), the Court of Appeals vacated the dismissal order and remanded for judicial review of the Secretary's decision. On March 15, 1978, I concluded that ALJ Neff had applied an incorrect legal standard for pain. Accordingly, I remanded the case to the Secretary for further proceedings to include "a full, fair and complete hearing where plaintiff is represented by counsel." (Document No. 15).

On remand, the Secretary assigned plaintiff's claim to ALJ John E. Walsh for an administrative hearing. ALJ Walsh states that he attempted to comply with my remand order, but after repeatedly advising plaintiff personally to secure counsel, plaintiff insisted on representing himself (Tr. 109–110). Finally, ALJ Walsh advised plaintiff that he would hold a hearing on plaintiff's claim on November 28, 1978, whether or not plaintiff had secured counsel. Plaintiff appeared *pro se* at the November 28 hearing. ALJ Walsh then proceeded to question plaintiff, but plaintiff refused to answer his questions. It appears from the hearing transcript that plaintiff believed his victory before the Court of Appeals to be an adjudication of his entitle-

ment to benefits. Therefore, plaintiff's purpose in attending the November 28 hearing was to collect his checks. When the ALJ attempted to inquire as to specifics of plaintiff's disability, plaintiff began yelling obscenities. The hearing was quickly brought to a close (Tr. 119–36).

Because of plaintiff's failure to cooperate, ALJ Walsh issued a recommended order of dismissal on December 28, 1978. The Appeals Council, however, determined that dismissal was inappropriate. Instead, after admitting the two x-ray reports from Philadelphia General Hospital, the Appeals Council again reviewed the entire record and concluded that the October 1, 1976 decision of ALJ Neff was indeed correct. The Appeals Council, therefore, reinstated and affirmed the October 1, 1976 decision (Tr. 103–04). The decision of the Appeals Council to reinstate the decision of ALJ Neff is now before me for review as the final decision of the Secretary.

After reviewing the record at length, I conclude that there is substantial evidence to support the finding that plaintiff is not disabled. With the exception of plaintiff's hip, there is no evidence that plaintiff's medical impairments either singly or in combination restrict his ability to perform substantial gainful activity. Plaintiff did testify that he suffers from asthma, allergies and has a collapsed lung. However, his testimony does not reveal that any of these ailments limit his residual functional capacity. Indeed, plaintiff testified that his allergies are controllable with proper diet and he has no complaints of shortness of breath. As for plaintiff's testimony that he received psychiatric care while a prison inmate during the late 1960's, there is no medical evidence of mental illness. Moreover, plaintiff has not been under psychiatric care since his release from prison, and he apparently has no difficulty in managing his own daily affairs. Finally, I cannot say that the ALJ erred in rejecting Dr. Ley's conclusion that plaintiff is disabled due to his back status. The only other evidence of record even remotely touching upon the condition of plaintiff's back is a statement by plaintiff

that he once encountered severe pain "while trying to help a guy put something on a truck" (Tr. 40). Throughout these protracted proceedings, plaintiff has never testified that a problem with his back prevents him from engaging in gainful employment. Furthermore, Dr. Ley's opinion appears to be based upon plaintiff's medical history. It is clear from Dr. Ley's report that Dr. Ley has no history of treating plaintiff,[3] and the record is otherwise devoid of any evidence that plaintiff has a history of back problems.

As plaintiff testified, his left hip presents his most serious medical impairment. Plaintiff did undergo surgery in 1973 for a total replacement of his left hip. Plaintiff claims that pain and stiffness associated with his hip now prevent him from performing any substantial gainful employment. ALJ Neff rejected plaintiff's claim that the severity of his pain is such that it prevents him from performing his prior work as a stock clerk or from engaging in sedentary work. I conclude that there is substantial evidence to support the ALJ's finding.

Although I earlier found that ALJ Neff applied an incorrect standard for pain, a fairer reading of the record demonstrates the ALJ did not rely solely on outward manifestations of pain. It is true that the ALJ considered plaintiff's demeanor at the hearing, but the ALJ also relied heavily on plaintiff's testimony concerning the limitations his hip placed on his daily activity. Plaintiff did testify to pain and stiffness. It is clear from the testimony, however, that the pain and stiffness are greatest when he attempts to walk after sitting for a long period:

Q Well, how does [your hip] restrict you; I mean, you seem to walk with a limp, but you walk OK. What problems do you have?

A Yeah. Well, like when I sit down for a long while, I get up, it's hard to walk. I go to start all over again. When it rains, I can't walk.

Q You say if you sit down for a long time, what happens?

A I don't know, it's—

Q Stiff or numb, or what?

A I guess it does something like that.

Q What do you mean, a long while? 2 hours, or how long? What do you mean by long while?

A Well, it's just painful, for the time I've been sitting here now, it will be painful for a little while, when I first start working [sic]. But after—

Q So you have to get up and walk, and then it'll work it out?

A Right. And I can't run. I can't run at all. My running days are over.

Q How about walking? How long can you walk before you get tired? Or can you do that well?

A Well, I can walk pretty good, because just the idea that I'm still walking, you know, and so I walk.

Q Do you ever have any difficulty in standing?

A No.

Q Do you have any difficulty in bending?

A Well, no. Sometimes—

Q Can you touch your toes?

A I haven't tried that.

Q Your knees?

A I grabbed a—I was trying to help a guy put something on a truck one day. And I bent over and picked it up, and I thought my back was gonna break. Man, I can't be doing nothing like that. I can't—

Q You can't lift things that are too heavy, huh?

A Right.

Q You carry out the trash where you live?

A No. Well, just in a room, my own paper bag.

Q But you do have to climb the steps?

A Yeah.

---

**3.** On page 3 of his report, Dr. Ley states that he performed no laboratory or special studies on plaintiff. The report then states that plaintiff is a "[p]revious patient of Dr. Bess" (Tr. 88). This is the sole mention of Dr. Bess in the entire record.

Q How many times do you climb the steps per day?

A Once or twice.

Q Have any trouble with hands?

A No.

Q Your arms?

A Nope.

Q How about your fingers?

A Nope.

Q Can you reach, without any problems?

A Yeah. I guess so. (UNINTELLIGIBLE) the reaching, but I probably could.

Q How did you get to the hearing today? I mean the bus, or drive, or trolley, or what?

A Well, I usually would catch a bus, but I walked. I didn't catch a bus. Like I said, I'd rather walk, because I can walk.

(Tr. 38–41).

It is plain from the record that ALJ Neff considered closely the plaintiff's evaluation of his condition. Indeed, in one of his hypotheticals to the vocational expert, ALJ Neff asked the expert to accept plaintiff's assessment of his own physical limitations. The vocational expert did so and still concluded that plaintiff was capable of performing a wide range of light to sedentary jobs (Tr. 49–51).

More importantly, plaintiff did not dispute the vocational expert's opinion that plaintiff was capable of performing as a drill press operator, bench assembler, etc. Plaintiff agreed that he could do "small work" (Tr. 51); but plaintiff was concerned that something might occur to aggravate his condition and prevent him from reporting regularly for work (Tr. 51–53). While I'm sure this is a very real fear, the ALJ was asked to determine whether plaintiff was disabled as of the date of the hearing, not whether plaintiff subsequently might become disabled.

In sum, there is substantial ·evidence to support the Secretary's finding that plaintiff is not disabled within the meaning of the Social Security Act. Accordingly, plaintiff's motion for summary judgment will be denied, the Secretary's motion will be granted, and judgment will be entered in favor of the Secretary.